IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America | ) |
| | ) |
| v. | ) No. 22 CR 58-1 |
| | ) |
| Donald Henkel, | ) |
|     a/k/a "D.B. Henkel," | ) |
|     a/k/a "Donavan Kelly," | ) |
|     a/k/a "Bruce Kelly," | ) |
| | ) |
|     Defendant. | ) |

Memorandum Opinion and Order

The seven-count superseding indictment in this case charges Donald Henkel and several co-defendants with carrying out a decades-long scheme to manufacture and trade in counterfeit art and sports paraphernalia. On July 7, 2020, federal and local law enforcement executed a search warrant on Mr. Henkel's residence and person on the outskirts of Traverse City, Michigan. Over the course of nearly five hours, a team of agents searched Mr. Henkel's home and barn, while FBI agents David White and Margaret O'Brien questioned Mr. Henkel about his dealings with various individuals and about the provenance and transaction history of several works of art and sports collectibles. Mr. Henkel has filed a motion to suppress his statements to the agents on the ground that he did

not receive *Miranda* warnings prior to his interrogation. The motion is denied for the reasons that follow.

*Miranda v. Arizona*, 384 U.S. 436 (1966), holds that a person who is in custody must "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444. In this context, "custody" is "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). Determining whether a suspect is in custody is an objective inquiry in which the court examines the totality of the circumstances and considers "whether a reasonable person would have believed that he or she was free to leave." *United States v. Thompson*, 496 F.3d 807, 810-11 (7th Cir. 2007).

In *Howes*, the Court catalogued the factors it considers relevant to the analysis: "(1) the location of the interrogation; (2) the duration of the interrogation; (3) any statements made by the suspect during the interrogation; (4) any use of physical restraints during the interrogation; and (5) whether the suspect was released at the end of the interrogation." 565 U.S. at 509 (citing cases). The Seventh Circuit has further refined the inquiry by providing "a non-exhaustive list of example factors, which includes: whether the encounter occurred in a public place; whether

2

the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed." *United States v. Patterson*, 826 F.3d 450, 455 (7th Cir. 2016). With these factors in mind, I have considered the record before me, including several hours of audio footage memorializing most of Mr. Henkel's encounter with the agents; transcripts of this footage; and the live testimony of Agent White and Mr. Henkel during an evidentiary hearing held on October 23, 2025. Based on these materials, I conclude that Mr. Henkel was not in custody for his interrogation.

The record reflects that at approximately 10:40 a.m., Agents White and O'Brien—both of whom were dressed in business attire and armed with weapons that were holstered and concealed under their jackets—knocked on the door of Mr. Henkel's home.[1] When Mr. Henkel answered the door, the agents introduced themselves and said they

---

[1] At the time, FBI Special Agent Russell Jewell and Corporal Andrew Bosscher of the Leelanau Sheriff's Department were waiting in a vehicle parked in or near the driveway. It is not clear whether Mr. Henkel saw these agents when he answered the door and began speaking to Agents White and O'Brien on his front porch, but nothing turns on this detail.

wanted to ask him questions about an individual "KS."[2] Mr. Henkel initially said he did not know a KS, so the agents offered to show him a photograph that was in their car. Agent White asked Mr. Henkel, "do you mind stepping outside?" Exh. D1 at 2. Mr. Henkel complied and asked, "what's going on here guys?" Exh. D1 at 2. The agents then told Mr. Henkel that they had a warrant to search his residence, which they also offered to show him. Mr. Henkel asked if he could first "use the bathroom real quick," but he was not permitted to return inside the house at that time. *Id.* at 3.

Mr. Henkel then followed the agents toward their car. Agent White explained, "we've got a team of people coming in-" to which Mr. Henkel responded "alright." Exh. D1 at 4. Moments later, a number of law enforcement vehicles carrying additional agents approached the house—there would be nineteen agents on the premises in total—prompting Mr. Henkel to exclaim, "Geez. Am I Roger Stone? Geez oh pizza!" *Id.* at 5. As numerous agents began clearing Mr. Henkel's house and barn to prepare for the search, Agents White and O'Brien explained that they would be looking for art-related items and records of transactions reflecting Mr. Henkel's sales of certain works of art. Questions along these lines—where Mr. Henkel obtained certain paintings and from whom, how much he paid for the

---

[2] Agent White identified KS to Mr. Henkel by his first and last name, but the parties refer to the individual by his initials in their public filings.

4

paintings, how much he sold them for and to whom, etc.—proceeded for another twenty to thirty minutes, with Mr. Henkel offering a succession of answers.

Approximately forty-five minutes into the interview, Agent O'Brien asked Mr. Henkel if he had any appointments that day, needed any medications from inside his home, or would like to sit down to wait while the other agents finished their sweep of the premises. Agent White then told Mr. Henkel: "So, you know, you're not under arrest. We just have a search warrant for your home. So just want to let you know that." *Id*. at 38-39. One might expect that at that point, a reasonable person not wishing to speak to the agents or remain in their company would say something along the lines of, "well if I am not under arrest, then I would like to leave," or at least ask whether she is free to do so. But Mr. Henkel did neither. Instead, he responded to Agent White's statement with this non-sequitur: "I've got a couple relatives that work for the FBI." *Id*. at 39.

Shortly thereafter, agents accompanied Mr. Henkel into the house to use the bathroom. Upon his return, Agent White reiterated: "Again, you're not in our custody. You're not going to be arrested. Certainly not today." *Id*. at 49. Again, Mr. Henkel expressed no desire to terminate the interview or to leave the scene.

Over the next several hours, Agents White and O'Brien asked Mr. Henkel additional questions about his involvement in buying,

5

altering, and selling various works of art and sports memorabilia. Mr. Henkel's answers frequently devolved into monologues on topics ranging from his resentment toward the hospital he believed was responsible for his daughter's disability, to his views on how history is taught in public schools, to the impossibility of creating original art and music. *See* Exh. D1 at 57-59. Indeed, throughout his interview, Mr. Henkel volunteered information well beyond the scope of the agents' questions. He shared his views on how to handle rebellious teenage children. *See* Exh. D2 at 39-40. He disclosed that his ex-wife had become a lesbian and that he had "disowned" both his brother and his sister due to differences in their political views and beliefs. *See id*. at 39-40, 56; Exh. D1 at 45, 58-59. He also peppered the agents with questions of his own spanning a wide range of topics: which artists Agent O'Brien studied in college; what kind of salaries FBI agents earned; and whether Agent White believed in God. Exh. D1 at 41-42, 46-48; Exh. D2 at 20. As the interview drew to a close, he quizzed Special Agent Jake Archer on Van Gogh trivia, culminating in a lively debate and Mr. Henkel's comment, "I love to talk to you. Like I said, I can talk to you all day long." *Id*. at 112. Indeed, Agent Archer tried several times to end the discussion, but Mr. Henkel prolonged the interaction, asking Agent Archer about his degree in art history and which artists he favored.

At times, Mr. Henkel's questions were more focused and seemed designed to ferret out what the agents' investigation had uncovered about his activities. For example, an exchange about the items to be taken from his house went like this:

> Henkel: Are you taking my sculptures?
> White: No, we're not taking-
> Henkel: Are you taking my grandfather clock up there and stuff or what?
> White: No. We're going to be taking the forgeries.
> Henkel: The forgeries?
> White: Yes.
> Henkel: And what might those entail? What are those?

Exh. D2 at 22-23. And an exchange about baseball bats Mr. Henkel allegedly altered and sold proceeded like this:

> White: You've sold bats for a hundred and fifty thousand dollars before or have created bats-
> Henkel: I've created bats for a hundred and fifty grand?
> White: That have sold for a hundred and fifty thousand dollars. Actually-
> Henkel: With who?
> White: With- what do you mean with who?
> Henkel: Who would I sell bats to for a hundred and fifty grand?
> White: These sports memorabilia places.
> …
> Henkel: I sold a bat with eight-added weight to a place...[f]or a hundred and fifty grand?
> White: That's my understanding.
> Henkel: Hm. I'd like to see that.

*Id*. at 25.

While this excerpt obviously represents only a small portion of Mr. Henkel's hours-long interrogation, it provides a flavor of its overall feel and illustrates that Mr. Henkel not only consented to speak to the agents, he actively engaged in the interview.

7

"Where a person voluntarily agrees to meet with law enforcement agents, that weighs against a finding that the person could reasonably believe he is in custody." *United States v. Ambrose*, 668 F.3d 943, 956 (7th Cir. 2012). Mr. Henkel's animated participation paints a picture not of a captive suspect cowed by the agents' show of authority into answering their questions, but rather of an eager interlocutor who believed he had something to gain by appearing to cooperate with their investigation.

It is true, of course, that due to the remote location of his home, Mr. Henkel's freedom to leave was objectively impaired by the agents' refusal to allow him inside his home, which held his phone, wallet, and keys to his truck. Nor did the agents advise Mr. Henkel in so many words that he was "free to leave." Furthermore, I am skeptical of Agent White's testimony that he would have given Mr. Henkel a ride into town had only he asked for one. To be sure, it was in the government's interest for Mr. Henkel to respond to the agents' questioning. But agents need not affirmatively facilitate a suspect's departure to avoid the inference that his questioning was custodial. On balance, I conclude that these factors do not outweigh others that indicate this was a consensual interaction.

Mr. Henkel's interrogation concluded at around 4:30 in the afternoon, after which he was permitted to reenter his house, shower, take his keys and wallet, and depart to a location of his

8

choice. Before leaving, he signed a consent to search form to allow the agents to continue their search the following day without the need for an additional warrant. Mr. Henkel was not asked to be present, and he was not present, for the second day of the search.

Considering the totality of the circumstances above, while it is clear that Mr. Henkel's freedom of movement was restricted in and around his residence while agents carried out their search, I am not persuaded that it was curtailed to an extent comparable to a formal arrest. *See Patterson*, 826 F.3d at 455. Accordingly, I conclude that Mr. Henkel was not "in custody" for purposes of the *Miranda* analysis.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: December 5, 2025